1  KELLY M. KLAUS (State Bar No. 161091)
   kelly.klaus@mto.com
2  ELIZABETH A. KIM (State Bar No. 295277)
   elizabeth.kim@mto.com
3  MUNGER, TOLLES & OLSON LLP
   350 South Grand Avenue
4  Fiftieth Floor
   Los Angeles, California 90071-3426
5  Telephone:  (213) 683-9100
   Facsimile:   (213) 687-3702
6
   MICHAEL B. DESANCTIS (admitted *pro hac vice*)
7  michael.desanctis@mto.com
   MUNGER, TOLLES & OLSON LLP
8  1155 F Street N.W., Seventh Floor
   Washington, D.C. 20004-1357
9  Telephone: (202) 220-1100
   Facsimile: (202) 220-2300
10
   Attorneys for Plaintiffs
11

12              UNITED STATES DISTRICT COURT

13     CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

14

15  Netflix Studios, LLC; Amazon Content          Case No. 2:18-CV-00230-MWF (AS)
    Services, LLC; Columbia Pictures
    Industries, Inc.; Disney Enterprises,         **APPLICATION FOR TEMPORARY**
16  Inc.; Paramount Pictures Corporation;         **RESTRAINING ORDER;**
    Twentieth Century Fox Film                    **MEMORANDUM OF POINTS AND**
17  Corporation; Universal City Studios           **AUTHORITIES IN SUPPORT**
    Productions LLLP; Warner Bros.                **THEREOF**
18  Entertainment Inc.

19            Plaintiffs,                          Ctrm:   5A (Hon. Michael W. Fitzgerald)
                                                   Filed concurrently:
20         vs.                                       Declaration of Matthew Fulton
                                                     Declaration of David Kaplan
21  Dragon Media Inc. d/b/a Dragon Box;              Declaration of Michael B. DeSanctis
    Paul Christoforo; Jeff Williams.                 [Proposed] Temporary Restraining
22                                                 Order and Order to Show Cause Why
              Defendants.                          Preliminary Injunction Should Not Issue
23

24

25

26

27

28

1      Plaintiffs Netflix Studios, LLC; Amazon Content Services, LLC; Columbia

2  Pictures Industries, Inc.; Disney Enterprises, Inc.; Paramount Pictures Corporation;

3  Twentieth Century Fox Film Corporation; Universal City Studios Productions

4  LLLP; and Warner Bros. Entertainment Inc. (collectively, "Plaintiffs"), hereby

5  apply to the Court pursuant to Federal Rule of Civil Procedure 65 and Local Rule

6  65-1 for a Temporary Restraining Order requiring Defendants Dragon Media, Inc.

7  d/b/a Dragon Box ("Dragon Media") and Paul Christoforo ("Christoforo") (jointly,

8  "Defendants") and all of their officers, agents, servants, employees, and attorneys,

9  and those persons in active concert or participation or privity with any of them, to

10  immediately cease and desist all actions infringing or inducing the infringement of

11  Plaintiffs' copyrighted works, and ordering Defendants to show cause why a

12  preliminary injunction should not issue.

13      In support of their application, Plaintiffs submit the attached Memorandum of

14  Points and Authorities, the contemporaneously filed Declarations of Matthew

15  Fulton, David Kaplan, and Michael B. DeSanctis, all pleadings and papers filed in

16  this action, the argument of counsel, and further evidence as the Court may consider

17  at or before a hearing regarding this Application or the hearing regarding the Order

18  to Show Cause and preliminary injunction requested herein.

19

20  DATED:  December 20, 2018        MUNGER, TOLLES & OLSON LLP

21

22

23              By:      */s/ Kelly M. Klaus*

24                   KELLY M. KLAUS

                 Attorneys for Plaintiffs

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

I.     INTRODUCTION ............................................................................................. 1

II.    FACTUAL BACKGROUND ........................................................................... 2

    A.     Defendants' Pre-Lawsuit Infringing Conduct ....................................... 2

    B.     After the Lawsuit was Filed, Defendants Continued to Induce Infringement ........................................................................................... 4

    C.     Defendants Plainly Intend To Induce Infringement ............................ 10

III.   ARGUMENT ................................................................................................. 11

    A.     Plaintiffs Will Succeed On The Merits ................................................ 12

        1.     Plaintiffs Own Their Copyrighted Works ................................. 12

        2.     Plaintiffs Will Prevail on Their Inducement Claims ................. 13

            (a)     Defendants Distribute the Dragon Box Service .............. 14

            (b)     Unauthorized Streaming of the Copyrighted Works Directly Infringes Plaintiffs' Public Performance Right ................................................................................ 14

            (c)     Defendants' Objective of Promoting and Inducing Infringement is Clear ..................................................... 16

            (d)     The Dragon Box Service Causes Infringement ............... 18

    B.     Defendants Causing Irreparable Harm ................................................ 19

    C.     The Balance of Hardships Strongly Favors Plaintiffs ......................... 22

    D.     Enjoining Defendants' Unlawful Conduct Will Advance the Public Interest ....................................................................................... 22

IV.    CONCLUSION .............................................................................................. 23

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

**FEDERAL CASES**

4
*A&M Records, Inc. v. Napster, Inc.*,
5
    239 F.3d 1004 (9th Cir. 2001) ...............................................................12

6
*In re Aimster Copyright Litig.*,
7
    334 F.3d 643 (7th Cir. 2003) .................................................................17

8
*American Broadcasting Cos., Inc. v. Aereo, Inc.*,
9
    134 S. Ct. 2498 (2014).............................................................................14

10
*Cadence Design Sys., Inc. v. Avant! Corp.*,
    125 F.3d 824 (9th Cir. 1997) ..................................................................22

11
12
*China Cent. Television v. Create New Tech. (HK) Ltd.*,
    No. CV 15-01869 MMM, 2015 WL 3649187 (C.D. Cal. June 11,
13
    2015) .......................................................................................................20

14
*Columbia Pictures Industries, Inc. v. Fung*,
15
    710 F.3d 1020 (9th Cir. 2013) ..................................................13, passim

16
*Disney Enter. V. VidAngel*,
17
    869 F.3d 848 (9th Cir. 2017) .............................................................20, 22

18
*Eldred v. Ashcroft*,
    537 U.S. 186 (2003) ................................................................................22

19
20
*Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*,
    915 F. Supp. 2d 1138 (C.D. Cal. 2012)............................................20, 21

21
22
*Fox Television Stations, Inc. v. FilmOn X LLC*,
    966 F. Supp. 2d 30 (D.D.C. 2013).....................................................15, 20

23
24
*Harper & Row Publishers, Inc. v. Nation Enters.*,
    471 U.S. 539 (1985) ................................................................................19

25
26
*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    518 F. Supp. 2d 1197 (C.D. Cal. 2007).................................................21

27
*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
28
    545 U.S. 913 (2005) ...................................................................13, passim

-ii-

1

## TABLE OF AUTHORITIES
(Continued)

2
                                                                                    **Page**

3 *Stuhlbarg Int'l Sales Co. v. John D. Brushy & Co.*,
4     240 F.3d 832 (9th Cir. 2001) ................................................................ 11, 20

5 *Twentieth Century Fox Film Corp. v. iCraveTV*,
6     No. Civ.A. 00-120, 2000 WL 255989 (W.D. Pa. Feb. 8, 2000) ......................... 15

7 *Unicolors, Inc. v. Urban Outfitters, Inc.*,
    853 F.3d 980 (9th Cir. 2017) ...................................................................... 17

8
9 *United Fabrics Int'l, Inc. v. C&J Wear, Inc.*,
    630 F.3d 1255 (9th Cir. 2011) ................................................................... 12

10
11 *Universal City Studios Productions LLLP et al. v. TickBox TV LLC et al.*,
    2018 WL 1568698 (No. 17-cv-07496-MWF) ................................... 1, passim

12
13 *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*,
    192 F. Supp. 2d 321 (D.N.J. 2002), aff'd 342 F.3d 191 (3d Cir.
14     2003) ...................................................................................................... 15

15 *Warner Bros. Entm't Inc. v. WTV Sys., Inc.*,
16     824 F. Supp. 2d 1003 (C.D. Cal. 2011) .................................... 15, 19, 20, 21

17 *Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .................................................................................... 12

18
19 *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 278 (2d Cir. 2012) .......................... 15, 21, 22

20 **FEDERAL STATUTES**

21 17 U.S.C. § 106 ........................................................................................... 12

22 17 U.S.C. § 106(4) ....................................................................................... 14

23 17 U.S.C. § 410(c) ....................................................................................... 12

24 17 U.S.C. § 502(a) ....................................................................................... 11

25 17 U.S.C. § 504(c) ....................................................................................... 21

26
27
28

PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER
CASE NO. 2:18-CV-000230 - MWF (AS)

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Defendants are intentionally inducing and materially and knowingly contributing to the mass infringement of Plaintiffs' motion pictures and television shows ("Copyrighted Works") through the sale of "Dragon Box" devices—computer hardware devices pre-loaded with illicit software for accessing content on the Internet.  Defendants' illicit devices operate in essentially the same way as the devices that this Court recently enjoined in *Universal City Studios Productions LLLP et al. v. TickBox TV LLC et al.*, 2018 WL 1568698 (No. 17-cv-07496-MWF) ("*TickBox*").  Dragon Box devices, like TickBox devices, offered customers a curated selection of illicit addons which search for, organize, and provide links to infringing streams of Plaintiffs' Copyrighted Works.

Upon the filing of the Complaint, Defendants briefly halted their sales of the Dragon Box devices.  Rather than seeking a preliminary injunction at that time, Plaintiffs' relied on Defendants' representations that they would either shut down the infringing service altogether or operate a lawful business.  Declaration of Michael B. DeSanctis ("DeSanctis Decl.") ¶ 3.

Despite their representations, Defendants have resumed what they have touted as a "multi-million dollar" business of enticing prospective purchasers to use Dragon Box devices to get free access to infringing content for which they otherwise would have to pay.  DeSanctis Decl. Ex. A.  Defendants recommenced their sales of Dragon Box devices, and then expanded their illicit operations by switching from one unauthorized content provider to another.  In light of this court's order in *TickBox* enjoining the same scheme of curating illicit addons and pairing those with the Kodi media player, Defendants modified the Dragon Box devices to stop relying on illicit addons to locate infringing content.  After several weeks of apparent technical issues, Defendants announced a new content provider for Dragon

Box customers: "BlendTV."  Despite Defendants' promises that BlendTV would be a licensed and legitimate service, it was not.

A few weeks after launching BlendTV, Defendants told customers that there were issues with BlendTV's operations and that BlendTV would no longer be available at the end of November 2018.

On December 11, 2018, the day after an unsuccessful mediation before Magistrate Judge Alka Sagar, Plaintiffs discovered that Defendants had launched yet another infringing service called "My TV Hub" *just hours after leaving the courthouse*.  DeSanctis Decl. ¶ 2.  The next day, Defendant Paul Christoforo, CEO of Dragon Media, Inc., failed to appear for his properly noticed deposition.

Defendants' game is clear:  every time they are caught marketing an infringing service to their customers, Defendants pull that service down and substitute another in its place.  My TV Hub is not licensed to stream Plaintiffs' Copyrighted Works, just as Blend TV was not before it, and just as the addons Defendants originally utilized was not.  Absent injunctive relief, Defendants will continue this game of Whac-a-Mole.  Nothing short of a Temporary Restraining Order ("TRO") to enjoin this latest service offering, and all similar offerings, will cause Defendants to cease their flagrantly infringing conduct.  Plaintiffs therefore respectfully request that the Court temporarily restrain Defendants' conduct immediately.

## II.    FACTUAL BACKGROUND

### A.    Defendants' Pre-Lawsuit Infringing Conduct

Defendants are Dragon Media, Inc. d/b/a Dragon Box ("Dragon Media"), and its CEO, Paul Christoforo.[1]  Like the defendants in *TickBox*, the *Dragon Box* Defendants took the hassle out of obtaining illegal Internet streams of movies and

---

[1] As there is no indication that defendant Jeff Williams is involved with the My TV Hub service, Plaintiffs seek relief only as to Defendants Dragon Media, Inc. and Paul Christoforo, referred to as "Defendants" throughout.

television shows by enabling their customers to find high-quality, high-speed, reliable—but completely illegal—sources for content.  Customers would pay for the device in a single payment that went directly to Defendants. The Dragon Box device then presented the customer with menus and other features to aid the customer in finding virtually any television show or movie, including movies still in theaters.  In turn, the device used software, i.e., illicit addons such as "Covenant," to link its customers to the content they've selected.  DeSanctis Decl. Exs. B, C; Declaration of Matthew Fulton ("Fulton Decl.") ¶¶ 4-11.  The content is unlicensed, i.e., infringing, and is streamed to the consumer without any royalties being paid to the rightful copyright owners.  When used in this way, as Defendants intended and instructed, Dragon Box devices gave Defendants' customers access to multiple sources that stream Plaintiffs' Copyrighted Works without authorization.

Defendants' pre-suit advertising left no doubt about what they were offering customers:




DeSanctis Decl. Ex. D.

Defendants urged customers to stream infringing content, including "virtually every movie," "Free Movies (In Theater)," "Free Kids Shows," and "so much more content," "Anytime For Free." DeSanctis Decl. Exs. D, BB; *TickBox,* 2018 WL 1568698, at *5-6 (telling customers they could "enjoy unlimited access to … Hollywood blockbusters… ABSOLUTELY FREE").

## B. After the Lawsuit was Filed, Defendants Continued to Induce Infringement

Shortly after Plaintiffs filed their complaint in this case, Defendants represented that they would stop selling Dragon Box devices. DeSanctis Decl. ¶ 3. Defendants also repeatedly represented, for several months, that Defendants soon would be pushing out a new software update that would allow Dragon Box users to stream only fully licensed content. *Id.* However, all existing users could continue using their Dragon Box devices to unlawfully access Plaintiffs' Copyrighted Works.

On September 2, 2018, Defendants announced that, "[i]nstead of closing [their] doors and shutting down all boxes and riding off into the sunset," Defendants would be "chang[ing] [their] business model." DeSanctis Decl. Ex. E. At that time, Defendants openly admitted that "the [Dragon] wizard facilitated" "copyright infringement," and reassured customers that there would be a software update. *Id.* Ex. F. Defendants explained that "Everyone … here knew that this wasn't going to last forever Hollywood was losing to[o] much money and all good things must come to an end it was a fun 5 years." *Id.* Ex. G.

### i. Defendants Launched a New Infringing Service - BlendTV

On September 18, 2018, Defendants announced that new software updates were available. DeSanctis Decl. Ex. H. On October 15, 2018, Defendants announced that "BlendTV" was now available, and that there would be "guide changes and tweaks from customer feedback as well as some more content" because "content is our biggest goal." *Id.* Ex. I. Plaintiffs promptly began investigating this new service.

1

2     After a customer downloaded the mandatory software update pushed out by

3   Defendants, he or she would see the menu depicted below, with a prominent button

4   for BlendTV:

5

6

7

8   

9

10

11

12

13

14

15   Fulton Decl. ¶ 16.

16     Selecting the BlendTV button depicted above would then launch the

17   following interface, which presented Defendants' customers with a variety of

18   options for content, including "Shows," "Movies," and "Your Watchlist."

19

20

21

22   

23

24

25

26

27

28

1   Fulton Decl. ¶ 20.

2         Dragon Box customers could then access streams of infringing content in one

3   of two ways: (1) "live" broadcast and cable television channels that are streamed

4   over the Internet as they are being broadcast; and (2) video-on-demand ("VOD")

5   options where a customer can select from dozens of options for television shows and

6   movies.  Fulton Decl. ¶ 22.  Dragon Box customers could "record" programs shown

7   on live television and play the recorded program at a later time of the customer's

8   choosing.  *Id.* ¶ 23.

9         As shown in the next screenshot, the "TV Guide" informed customers when

10  they could watch "live" transmissions of content, and indicated with a red dot

11  whether the content is "RECORDED" and therefore available on-demand.  Fulton

12  Decl. ¶¶ 24-25.



24  Fulton Decl. ¶ 24.

Customers could also use the "SEARCH" function circled in red above to find popular movies and television shows.  For example, a Dragon Box customer who used BlendTV to search for Warner Bros.' box office hit *Wonder Woman* would have had easy and immediate access to the motion picture.  As shown below, the customer would be presented with three results, each of which included a date and time during which the film would be broadcast live on their Dragon Box device.



Fulton Decl. ¶ 27.

In addition to learning when *Wonder Woman* would be streamed live, the customer would also have had access to an on-demand infringing stream of *Wonder Woman* because there was a "RECORDED" copy.  Fulton Decl. ¶ 28.  Dragon Box presented customers with a high-quality stream in a familiar interface with buttons for rewind, stop, fast-forward, closed captioning, and a progress bar.

Fulton Decl. ¶ 28.

    As shown above, Plaintiffs confirmed the availability of their Copyrighted Works on BlendTV, but Plaintiffs had never authorized or licensed BlendTV to stream their works. Despite Defendants' representations to the contrary, it turned out that Defendants had merely changed the underlying *source* of the unauthorized content that Dragon Box devices relied on to stream content. Though Plaintiffs informed Defendants that BlendTV did not have licenses for their Copyrighted Works, Defendants continued to sell and promote the Dragon Box device with the BlendTV service. Plaintiffs informed Defendants through counsel that Plaintiffs intended to move for a preliminary injunction.

    Within three weeks of launching BlendTV, Defendants announced their intent to switch to yet another, purportedly lawful, content provider and informed customers via Facebook that BlendTV would not be available as of November 26, and recommended that customers try a different service while Defendants worked to resolve the issue or find another content provider. DeSanctis Decl. Ex. J.

ii.     **Following an Unsuccessful Mediation, Defendants Launched Another Infringing Service - MyTVHub**

After Defendants announced the imminent end of the BlendTV service, the parties agreed to engage in a mediation before Magistrate Judge Sagar on December 10, 2018.  The mediation was unsuccessful.  DeSanctis Decl. ¶ 2.

The next day, Plaintiffs discovered Defendants had launched yet another infringing service called "My TV Hub."  Though branded differently, My TV Hub appears to be a copycat of BlendTV:



Fulton Decl. ¶ 31.  The only difference is that the branded logos in the top left-hand-corner are specific to each service.

My TV Hub, like each of Defendants' prior infringing offerings, provides customers with easy and near-instantaneous access to illegal streams of Plaintiffs' Copyrighted Works.  As depicted below, on December 11, 2018, investigators for the Motion Picture Association of America ("MPAA") found and streamed a "RECORDED" copy of Fox's superhero hit *Logan*.  Fulton Decl. ¶ 32.   Just as with BlendTV, My TV Hub offers customers options to watch a "live" transmission of *Logan* on the Cinemax channel at the specified time and date, or to watch a "RECORDED" copy of *Logan* on-demand.

-9-



Fulton Decl. ¶ 32.

With the freshly minted new My TV Hub service, Defendants continue to knowingly induce the widespread infringement of Plaintiffs' Copyrighted Works by encouraging Dragon Box customers to access infringing streams through the latest iteration of the Dragon Box Service.

**C.    Defendants Plainly Intend To Induce Infringement**

Despite their assurances to the contrary, Defendants' advertising for BlendTV and My TV Hub demonstrates their clear intent to induce infringement.  Defendants told prospective customers that Dragon Box devices, powered by BlendTV, give customers "over 65 Live US TV Channels. 30 hours of Cloud-PVR, 7-day Playback, and watch on the go options" "for only $39.95 per month."  DeSanctis Decl. Ex. K, L.  The "Cloud-PVR" option that Defendants advertise is a "Personal Video Recording" feature that allows customers to record and play back infringing content at a time that is convenient for them.  Defendants advertise *identical* features for My TV Hub.  *Id.* Exs. M, N.   In fact, Defendants inform customers on Facebook that "[a]ll subscribers to Blend can resign up under My TV Hub."  *Id.* Ex. O.

Defendants explain that they "are now content providers" and that customers who use My TV Hub will "get more than ever," and can "Watch what you want, when you want, how you want" with "No annual contracts! No installation guy! No extra fees!" *Id.* Exs. M, P.

Defendants have tried to obscure their illegal conduct by calling their offerings "legal cable service[s]." DeSanctis Decl. Ex. P. This is a fig leaf that Defendants themselves cannot maintain when trying to hook customers. For example, Defendants told actual and prospective customers through promotions on Facebook that "Blend TV is going to be an amazing service our goal is to get you as much content as we can for as less as we can." *Id.* Ex. G.

Defendants are promoting My TV Hub in exactly the same way. They apologized to customers for having switched from Blend TV, saying "all you will have to do is go to a new website and resubscribe and log in and the content will be there plus more." *Id.* Ex. Q. Defendants then urged customers to "please try" My TV Hub, promising customers that "you will not be disappointed." *Id.* Ex. K.

Defendants' playbook is transparent: they have promoted and unless enjoined will continue to utilize and promote any illicit streaming service they think they can sell to customers as providing copyrighted content for nothing. Plaintiffs have no choice but to seek this Court's urgent equitable relief.

## III.    ARGUMENT

The Copyright Act authorizes courts to grant injunctive relief "to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). The standard for issuing a TRO is the same as that for issuing a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brushy & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). Plaintiffs meet all the requirements for a TRO: (1) they are likely to succeed on the merits of their claim for copyright infringement; (2) they will suffer irreparable harm absent injunctive relief; (3) the balance of hardships tips in their favor; and (4) injunctive

1  relief is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20

2  (2008).

3  **A.     Plaintiffs Will Succeed On The Merits**

4  To prevail on their infringement claims, Plaintiffs need only (1) "show

5  ownership" and (2) a violation of "at least one exclusive right" under 17 U.S.C.

6  § 106.  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001).

7  Plaintiffs satisfy both requirements.

8  **1.     Plaintiffs Own Their Copyrighted Works**

9  Plaintiffs' ownership of the Copyrighted Works is indisputable.  Plaintiffs,

10  directly or through their affiliates, create and distribute some of the most popular

11  and critically acclaimed motion pictures and television programs in the world.

12  Plaintiffs authorize the distribution and public performance of their Copyrighted

13  Works in various formats and through multiple distribution channels, including:  for

14  exhibition in theaters; through television broadcasts; and through cable and direct-

15  to-home satellite services (including basic, premium, and "pay-per-view").

16  Declaration of David Kaplan ("Kaplan Decl.") ¶¶ 6-7.  Plaintiffs also distribute,

17  publicly perform, and license their works through authorized Internet Video-on-

18  Demand ("VOD") services, such as Hulu, iTunes, Google Play, VUDU, Netflix, and

19  Amazon.[2]  *Id.* ¶¶ 6(e)-6(f), 20.

20  Exhibit R to the accompanying Declaration of Michael B. DeSanctis includes

21  a representative list of Copyrighted Works that are infringed through Dragon Box.

22  DeSanctis Decl. Ex. R.  The Copyright Office has issued certificates of registration

23  for each of these Works.  *Id.* Exs. S - AA.  These certificates create a presumption of

24  copyright validity and ownership.  17 U.S.C. § 410(c); *United Fabrics Int'l, Inc. v.*

25  *C&J Wear, Inc.*, 630 F.3d 1255, 1257 (9th Cir. 2011).

26  _____

27  [2] Plaintiffs Netflix Studios, LLC and Amazon Content Services, LLC are the

28  content-production affiliates of (respectively) the Netflix and Amazon streaming
services.

-12-

## 2.      Plaintiffs Will Prevail on Their Inducement Claims

Copyright owners may bring infringement claims not only against those parties who directly infringe their exclusive rights but also against those who are secondarily liable for that infringement.  *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005).  Where direct infringers use a "widely shared service or product" to commit infringement, "it may be impossible to enforce rights in the protected work effectively against all direct infringers, the only practical alternative being to go against the distributor of the copying device for secondary liability on a theory of contributory or vicarious infringement." *Id.* at 929-30.  Secondary liability is particularly critical in the online context, because "digital distribution of copyrighted material threatens copyright holders as never before." *Id.* at 928-29.

The Supreme Court therefore held in *Grokster* that a party that distributes a product "with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." *Id.* at 936-37.

In *Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020 (9th Cir. 2013), the Ninth Circuit examined *Grokster* in detail.  The court held the defendant (Fung) was liable for inducement for operating a so-called "torrent" site called "isoHunt." isoHunt collected and indexed "torrent files" to help users find and download infringing copies of movies and television shows.  *Id.* at 1028-29.  Although Fung did not distribute the infringing copies, the Ninth Circuit nevertheless held that, under *Grokster*, Fung's "purposeful involvement in the process of" infringement was sufficient to trigger inducement liability.  *Id.* at 1033.

As the Ninth Circuit explained in *Fung*, a plaintiff establishes inducement liability by showing:  "(1) distribution of a device or product [by defendant], (2) acts of infringement [by third parties], (3) an object [of the defendant] of promoting [the

-13-

device's or product's] use to infringe copyright, and (4) causation."  *Id*. at 1032 (citing *Grokster*, 545 U.S. at 936-37).  All four elements are easily satisfied here.

*(a)*     *Defendants Distribute the Dragon Box Service*

Defendants market, promote, and sell BlendTV and My TV Hub as part of the "Dragon Box Service."  Defendants sell Dragon Box devices, which rely on infringing services like BlendTV and My TV Hub for content, and sell subscriptions to BlendTV and My TV Hub.  For purposes of inducement liability, the Dragon Box Service is a "device or product" that enables and encourages infringing conduct. *Fung*, 710 F.3d at 1033 ("services available on the Internet" basis for inducement liability).

*(b)*     *Unauthorized Streaming of the Copyrighted Works*
*Directly Infringes Plaintiffs' Public Performance Right*

Defendants' advertised purpose and achieved objective in distributing the Dragon Box Service is the unauthorized streaming of copyrighted works by third parties.  Defendants therefore induce the widespread, direct infringement of Plaintiffs' public performance right.

Plaintiffs have the exclusive right, among others, "to perform" the Copyrighted Works "publicly."  17 U.S.C. § 106(4).  Under the "Transmit Clause," contained in Section 101's definition of the public performance right, a party performs a work publicly when it "transmit[s] or otherwise communicate[s] a performance … of the work … to the public, by means of any device or process, whether the members of the public capable of receiving the performance … receive it in the same place or in separate places and at the same time or at different times." *Id.* § 101(2) (definition of "[t]o perform … a work 'publicly'").

"Broadcasting copyrighted video content to the public over the internet without authorization infringes upon the copyright owner's public performance right."  *TickBox*, 2018 WL 1568698, at *9 (citing *American Broadcasting Cos., Inc. v. Aereo, Inc.*, 134 S. Ct. 2498, 2509 (2014) (service that made Internet streams of

-14-

content performed publicly:  "Aereo communicates the same contemporaneously perceptible images and sounds to a large number of people who are unrelated and unknown to each other.")); *see also, e.g.*, *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 278 (2d Cir. 2012) ("undisputed" that defendant's Internet streaming of television programs infringed public performance right); *Warner Bros. Entm't Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1010 (C.D. Cal. 2011) ("*Zediva*") (Internet streaming of movies and television shows from remote DVD players to users is a public performance); *Fox Television Stations, Inc. v. FilmOn X LLC*, 966 F. Supp. 2d 30, 46-47 (D.D.C. 2013) ("FilmOn X transmits (i.e., communicates from mini-antenna through servers over the Internet to a user) the performance (i.e., an original over-the-air broadcast of a work copyrighted by one of the Plaintiffs) to members of the public (i.e., any person who accesses the FilmOn X service through its website or application) who receive the performance in separate places and at different times (i.e. at home at their computers or on their mobile devices)."); *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 192 F. Supp. 2d 321, 332 (D.N.J. 2002) ("Because transmission of the clip previews to individual computers occurs when any member of the public selects an icon that redirects him or her to Video Pipeline's website, from which the video clips are then shown, such actions by Video Pipeline constitute a 'public performance'"), *aff'd* 342 F.3d 191 (3d Cir. 2003); *Twentieth Century Fox Film Corp. v. iCraveTV*, No. Civ.A. 00-120, 2000 WL 255989, at *7 (W.D. Pa. Feb. 8, 2000) (Internet transmissions violated plaintiffs' public performance rights "by transmitting (through use of 'streaming' technology) performances of the works to the public by means of the telephone lines and computers that make up the Internet.").

Defendants' intended use of the Dragon Box Service is for customers to select titles and receive unauthorized streams from My TV Hub (and its short-lived predecessor BlendTV), which has no right to exercise Plaintiffs' public performance right.  My TV Hub transmits performances of the Copyrighted Works to

Defendants' customers.  As in *TickBox*, Defendants serve as an "intermediary" between My TV Hub, an unauthorized source of infringing public performances, and an audience of Dragon Box customers by "funneling users to" My TV Hub. *TickBox*, 2018 WL 1568698, at *10.  Defendants' conduct in promoting, advertising, and bundling My TV Hub with Dragon Box devices "undoubtedly enlarges that audience and thereby enlarges the scope of the infringement." *Id.*

### (c)    Defendants' Objective of Promoting and Inducing Infringement is Clear

Defendants knowingly distribute the Dragon Box Service "with the object of promoting its use to infringe copyright." *Fung*, 710 F.3d at 1034 (quoting *Grokster*, 545 U.S. at 936-37).

First, prior to this lawsuit, Defendants advertised and promoted Dragon Box as a means of streaming anything and everything their customers could possibly want to see.  Defendants marketed Dragon Box devices as a means for customers to "Watch your Favourites Anytime For FREE," "Watch virtually every movie, Most in High Definition, TV Shows and Sports … and much more."  DeSanctis Decl. Ex. D.  Defendants have promised prospective customers that, with a Dragon Box device, customers could access "Free movies in theaters" and that "so much more content" is free.  *Id.* Ex. BB.

After being sued, Defendants told customers that, "[i]nstead of closing [Dragon Box's] doors and shutting down all boxes and riding off into the sunset," Defendants would "adapt to change and continue to try and bring you the best legal content we can and add in as many services we can to make Dragon Box the box that beats any competitors out there."  DeSanctis Decl. Ex. E.  Defendants simultaneously confirmed that they knew all along they were "facilitat[ing]" "copyright infringement." *Id.* Ex. P.

Following their admission of unlawful conduct and subsequent commitment to customers, Defendants began looking for an alternative to the illicit addons that

-16-

1  had powered the Dragon Box devices' ability to "facilitate[]" infringement.

2  DeSanctis Decl. Ex. F.  Defendants briefly found a new content provider in

3  BlendTV and are now promoting My TV Hub as the latest incarnation of their

4  business model.  Defendants use My TV Hub to achieve the same result for their

5  customers:  a user-friendly interface and the means by which to obtain near-

6  instantaneous access to obviously infringing content.  *See supra* Part __.

7  Defendants provide Dragon Box customers with easy access to infringing content

8  through My TV Hub, which Defendants have integrated into the Dragon Box user

9  interface and business model.

10      Second, Defendants continue to make clear by their conduct and admissions

11  that they are intentionally inducing infringement.  Defendants tell customers that if

12  they use the Dragon Box Service, it will "make it effortless to find what you want to

13  watch," without having to pay the full cost for that content.  DeSanctis Decl. Ex.

14  CC.  Defendants advertise its service as costing only a fraction of legitimate cable

15  television packages, but somehow offering more—and premium—content.

16      Given the obviously infringing nature of BlendTV and My TV Hub and

17  Defendants' own history of unlawfully exploiting Plaintiffs' Copyrighted Works,

18  Defendants cannot plausibly assert that their conduct is innocent.  The best that

19  could be said of Defendants' continued wrongful conduct is that they intentionally

20  ignored the infringing nature of these services, but "[w]illful blindness is

21  knowledge, in copyright law … as it is in the law generally." *In re Aimster*

22  *Copyright Litig.*, 334 F.3d 643, 650 (7th Cir. 2003).  After knowingly inducing

23  infringement for a "fun 5 years," (DeSanctis Decl. Ex. G), Defendants' apparent

24  failure to make any meaningful "attempt to check or inquire into" whether Plaintiffs

25  had authorized BlendTV's use of Plaintiffs' Copyrighted Works is more than

26  "sufficient evidence of willful infringement." *Unicolors, Inc. v. Urban Outfitters,*

27  *Inc.*, 853 F.3d 980, 991 (9th Cir. 2017); *see Aimster*, 334 F.3d at 650 ("One who,

28  knowing or strongly suspecting that he is involved in shady dealings, takes steps to

-17-

make sure that he does not acquire full or exact knowledge of the nature and extent of those dealings is held to have a criminal intent.").  That Defendants have now switched to an essentially identical service, My TV Hub evinces Defendants flagrant disregard for Plaintiffs' rights and the copyright laws.

Third, Defendants have "show[n] [themselves] to be aiming to satisfy a known source of demand for copyright infringement":  their own customers who previously used Defendants' curated, illicit addons to stream infringing content. *Grokster*, 545 U.S. at 939.  Having been forced to cease their promotion of illicit addons such as "Covenant," Defendants now tell Dragon Box customers that "the content will be there plus more" if they just subscribe to My TV Hub and continue using the Dragon Box Service. *See supra* Part __.  This substitution of one infringing source of content for another is business-as-usual for Defendants, and unmistakable evidence of Defendants' intent to induce infringement.

Fourth, there is no evidence that Defendants have taken any steps "to develop filtering tools or other mechanisms to diminish the infringing activity" by their customers. *Grokster*, 545 U.S. at 939.  This fact accords with Defendants' infringement-related profits:  Defendants "undoubtedly sold" and continue to sell "more Devices than [they] otherwise would have as a result of affirmatively advertising it as a means of accessing unauthorized content." *TickBox*, 2018 WL 1568698, at *11.  This also "corroborate[s] the conclusion that [Defendants] 'acted with a purpose to cause copyright violations by use of' [their] services." *Fung*, 710 F.3d at 1036 (quoting *Grokster*, 545 U.S. at 938).

### (d)    The Dragon Box Service Causes Infringement

Plaintiffs likewise satisfy the causation element.  "[I]f one provides a service that could be used to infringe copyrights, with the manifested intent that the service actually be used in that manner, that person is liable for the infringement that occurs through the use of the service." *Fung*, 710 F.3d at 1037.  "[T]he only causation requirement is that the product or service at issue was used to infringe the plaintiff's

-18-

1   copyrights." *Id*.  The "culpable act is not merely the encouragement of infringement
2   but also the distribution of the tool intended for infringing use."  *Grokster*, 545 U.S.
3   at 940, n.13.

4        Defendants promote and distribute the Dragon Box Service for infringing use,
5   and that is exactly the use to which the service is put.  Defendants sell Dragon Box
6   devices and subscriptions to My TV Hub promising access to "65 Live US TV
7   Channels," and "500,000+ movies and TV episodes from top free and paid
8   channels" for only $39.95 per month.  DeSanctis Decl. Ex. K, L, CC.  As for
9   customers who purchased Dragon Box devices based on pre-lawsuit promises of
10  access to illicit addons for Kodi, Defendants implore them to "please try" My TV
11  Hub, promising that customers "will not be disappointed." *Id*. Ex. P.  Dragon Box
12  customers then use the device and service for exactly that purpose, i.e., to engage in
13  unauthorized streaming of Copyrighted Works.  Defendants' conduct causes
14  infringement.  *See Grokster*, 545 U.S. at 940; *Fung*, 710 F.3d at 1037.

15       **B.    Defendants Causing Irreparable Harm**

16       Defendants are causing Plaintiffs irreparable harm.  *See* Kaplan Decl. ¶¶ 12-
17  31.

18       First, by inducing unauthorized streaming, Defendants deprive Plaintiffs of
19  their exclusive rights to control how, when, and to whom they will disseminate their
20  Copyrighted Works. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S.
21  539, 546 (1985) ("The rights conferred by copyright are designed to assure
22  contributors to the store of knowledge a fair return for their labors."); *Zediva*, 824 F.
23  Supp. 2d at 1012-13 (defendants' unauthorized streaming "interfere[s] with
24  Plaintiffs' ability to control the use and transmission of their Copyrighted Works,
25  thereby causing irreparable injury.").

26       Second, the availability of infringing copies of the Copyrighted Works for
27  streaming from unauthorized sources via the Dragon Box Service inevitably and
28  irreparably undermines the legitimate market in which consumers can purchase

access to the same works, into which Plaintiffs have invested significantly.  *See e.g.*, *Grokster*, 545 U.S. at 928-29 (discussing harms from unauthorized distribution of copyrighted works); *China Cent. Television v. Create New Tech. (HK) Ltd.,* No. CV 15-01869 MMM (MRWx), 2015 WL 3649187, at *13 (C.D. Cal. June 11, 2015) (infringing video streaming service caused irreparable harm because it "interfered with plaintiffs' ability to develop a lawful market for internet distribution"); *TickBox*, 2018 WL 1568698, at *12-13; Kaplan Decl. ¶¶ 24-28.  As evident from Defendants' advertising campaign, Dragon Box intentionally competes with authorized and legitimate offerings, including authorized cable and broadcast networks and licensed VOD services.  Defendants promote Dragon Box devices with My TV Hub subscriptions as a means for consumers to avoid the need to pay for subscriptions to legitimate offerings.  *Id.*

Third, Defendants threaten harm to Plaintiffs' relationships and goodwill with authorized licensees, which further establishes irreparable harm.  *See Disney Enter. V. VidAngel*, 869 F.3d 848, 866 (9th Cir. 2017) ("substantial evidence … that VidAngel's service undermines the value of the Studios' copyrighted works, their 'windowing' business model, and their goodwill and negotiating leverage with licensees"); *Stuhlbarg Int'l Sales Co.*, 240 F.3d at 841 ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."); *see also TickBox*, 2018 WL 1568698, at *13 ("[I]nterference with relationships with distributors and licensees, and the undermining the market and [plaintiff's] business model more generally—have been recognized as sufficiently irreparable to support the issuance of a preliminary injunction."); *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F. Supp. 2d 1138, 1147 (C.D. Cal. 2012) ("availability of Plaintiffs' content from sources other than Plaintiffs also damages Plaintiffs' goodwill with their licensees."); *Zediva*, 824 F. Supp. 2d at 1012-13 (unauthorized streaming "interfere[d] with …  Plaintiffs' relationships, including the goodwill developed with their licensees"); *FilmOn X,*

-20-

966 F. Supp. 2d at 49-50 (unauthorized streaming "damage[s Plaintiffs'] contractual relationships and ability to negotiate with authorized retransmitters," causing irreparable harm); Kaplan Decl. ¶¶ 17-23.

Fourth, money damages will not adequately compensate Plaintiffs for the loss of control over the Copyrighted Works, the damage to their business goodwill, and harm to the continued advancement of the legitimate online market for distribution of creative works. *See TickBox*, 2018 WL 1568698, at *13 ("[I]t is unlikely that money damages could adequately compensate for difficult-to-quantify harms to Plaintiffs' business models and relationships" from unauthorized streaming); *WPIX, Inc.*, 691 F.3d at 286 (unrestrained unauthorized Internet retransmissions of broadcast programming "would encourage" other services to follow suit, "weaken plaintiffs' negotiating position," adversely affect "quantity and quality of efforts put into creating" new works, and "drastically change the industry, to plaintiffs' detriment"); *Zediva*, 824 F. Supp. 2d at 1013 (same); Kaplan Decl. ¶¶ 15, 17, 21, 23-25, 28-30.

Money damages also are inadequate because there is no reasonable prospect that Defendants will be able to satisfy an award in this case. The statutory damages for each work infringed through Defendants' willful inducement may be as much as $150,000. 17 U.S.C. § 504(c). Plaintiffs collectively own thousands of Copyrighted Works, a substantial number of which have been infringed as the result of Defendants' illegal conduct. Defendants therefore will be responsible for a damages award far in excess of their ability to pay. *See, e.g.*, *BarryDriller Content Sys.*, 915 F. Supp. 2d at 1147; *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1217 (C.D. Cal. 2007) ("[A]n award of monetary damages will be meaningless, and the plaintiff will have no substantive relief, where it will be impossible to collect an award for past and/or future infringements perpetrated by a defendant.").

1

### C.   The Balance of Hardships Strongly Favors Plaintiffs

2     Whatever harm may come to the Defendants' ability to induce infringement is

3 far outweighed by the hardship Plaintiffs will face if the Court were to deny their

4 application for a TRO and preliminary injunction.  The absence of injunctive relief

5 would result in the continued flagrant infringement of Plaintiffs' rights.  In contrast,

6 Defendants would suffer no harm from being enjoined from engaging in unlawful

7 conduct, consistent with the longstanding principle recently reaffirmed by the Ninth

8 Circuit "that harm caused by illegal conduct does not merit significant equitable

9 protection."  *VidAngel*, 869 F.3d at 867; *see also Cadence Design Sys., Inc. v.*

10 *Avant! Corp.*, 125 F.3d 824, 830 (9th Cir. 1997) ("[w]here the only hardship that the

11 defendant will suffer is lost profits from an activity which has been shown likely to

12 be infringing, such an argument in defense merits little equitable consideration. . . ."

13 (quotations and citations omitted)); *WPIX*, 691 F.3d at 287 ("axiomatic that an

14 infringer of copyright cannot complain about the loss of ability to offer its infringing

15 product" (quotations and citations omitted)).

16

### D.   Enjoining Defendants' Unlawful Conduct Will Advance the Public Interest

17

18     "[T]he public has a compelling interest in protecting copyright owners'

19 marketable rights to their work and the economic incentive to continue creating

20 television programming and motion pictures."  *VidAngel*, 869 F.3d at 867

21 (quotations and citations omitted); *see Eldred v. Ashcroft*, 537 U.S. 186, 212 n.18

22 (2003) ("[t]he economic philosophy behind the [Copyright] [C]lause . . . is the

23 conviction that encouragement of individual effort by personal gain is the best way

24 *to advance public welfare* through the talents of authors and inventors" (emphasis

25 added)).  Enjoining Defendants' illegal conduct thus plainly furthers the public

26 interest.

27

28

**IV.    CONCLUSION**

Plaintiffs respectfully request that the Court enter the proposed TRO immediately and issue an Order to Show Cause Why a Preliminary Injunction Should Not Issue.


DATED:  December 20, 2018          MUNGER, TOLLES & OLSON LLP



By: _____/s/ Kelly M. Klaus_____
          KELLY M. KLAUS
          Attorneys for Plaintiffs